IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILLIAM A. MURRAY, | § | |
| | § | |
| Petitioner, | § | CIVIL ACTION NO. |
| | § | 3:01-CV-2089-P |
| v. | § | |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| DIRECTOR, TEXAS DEPARTMENT | § | |
| OF CRIMINAL JUSTICE, | § | |
| INSTITUTIONAL DIVISION, | § | |
| | § | |
| Respondent. | § | |
| | § | |

## **MEMORANDUM OPINION AND ORDER**

Now before the Court is Petitioner's Second Amended Petition for Habeas Corpus pursuant to 28 U.S.C. § 2254. United States Magistrate Judge William F. Sanderson, Jr., issued his Findings, Conclusions, and Recommendation on January 30, 2003. Petitioner objected on February 10, 2003. In regards to the first, second, fourth, fifth, and sixth grounds for relief, the Court is of the opinion that the Findings, Conclusions, and Recommendation are correct and hereby accepts them as the findings and conclusions of the Court. In regards to ground three, the Court states below its reasons for denying Petitioner's request for relief under 28 U.S.C. § 2254. Because Petitioner has failed to assert valid grounds for relief under 28 U.S.C. § 2254, the Court hereby DENIES the Petitioner's Second Amended Petition for Habeas Corpus. A Certificate of Appealability is GRANTED.

**I. Background and Procedural History**

This is a suit for habeas corpus relief, pursuant to 28 U.S.C. § 2254, filed by William A. Murray, who has received a death sentence for capital murder from the State of Texas. Murray was convicted and sentenced to death in June 1999 for murdering Rena A. Ratcliff in the course of committing or attempting to commit aggravated sexual assault.

Having received the death sentence, Murray's conviction was automatically appealed to the Texas Court of Criminal Appeals. However, before briefs were submitted, Murray's appellate counsel filed a motion seeking to abate the appeal and extend the time for briefing as a result of Murray's expressed desire to waive his right to appeal. The Texas Court of Criminal Appeals granted this motion and remanded the case to the state district court for "a hearing on appellant's professed 'desire to waive my right to appeal.'" *William A. Murray v. Texas*, No. 73,454, slip. op. at 2 (Tex. Crim. App. Nov. 1, 1999).

The state district court held this hearing on November 18, 1999. Petitioner was the only witness who testified at the hearing, but his counsel did also state some opinions regarding his decision-making and ability to understand the proceedings. No psychiatric or psychological testimony was taken, although the trial judge did refer to the testimony of two psychiatrists at trial.

Following this hearing, the state district court issued the following findings:

> After reviewing the evidence before the Court and the pertinent law, the Court finds that William A. Murray, has been fully admonished of his right to appeal. The Court further finds that William A. Murray has voluntarily, knowingly and intelligently given up his right to appeal.

*Texas v. Murray*, No. 19071 (86th Dist. Ct., Kaufman County, Tex. Dec. 6, 1999). The Court of Criminal Appeals subsequently accepted the waiver, reviewed the conviction and sentence for

fundamental error, and affirmed the conviction and death sentence in an unpublished opinion delivered on January 20, 2000.  Murray subsequently filed a motion for rehearing to reinstate his appeal on February 7, 2000, and this motion was denied on March 29, 2000.  A petition for writ of certiorari was filed with the Supreme Court of the United States on June 30, 2000, and denied on October 16, 2000.

On March 27, 2001, Petitioner filed an Application for Writ of Habeas Corpus with the state trial court.  The trial court issued Findings of Fact and Conclusions of Law recommending that relief be denied on September 5, 2001, and the Texas Court of Criminal Appeals denied habeas relief on the basis of these findings and conclusions on October 3, 2001.

Petitioner filed his original § 2254 petition on April 24, 2002, and his first amended petition on September 13, 2002.  On January 30, 2003, United States Magistrate Judge William F. Sanderson, Jr., recommended that the petition be denied.  Petitioner filed objections on February 10, 2003.

On January 30, 2004, the Court authorized Murray to file his second amended petition to add a claim based on *Atkins v. Virginia*, 536 U.S. 304 (2002).  Since that time, Murray has abandoned his *Atkins* claim.

On October 18, 2004, Murray filed a Trial Brief in support of his petition and objections to the Magistrate Judge's Recommendation.  Respondent filed an Advisory to the Court on November 30, 2004, asserting that the case was ripe for a decision.

## II. Legal Standard

Pursuant to 28 U.S.C. § 2254(d), as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), a state prisoner may not obtain habeas relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West Supp. 2006). "Section 2254(d)(1) provides the standard of review for questions of law and mixed questions of law and fact." *Caldwell v. Johnson*, 226 F.3d 367, 372 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "Section 2254(d)(2) pertains to questions of fact." *Patterson v. Dretke*, 370 F.3d 480, 484 (5th Cir. 2004) (citing *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000)). Under § 2254(e)(1), the state court's factual findings are "presumed to be correct" unless the petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C.A. § 2254(e)(1) (West Supp. 2006).

## III. Analysis

After Petitioner indicated that he wanted to waive his direct appeal, the Texas Court of Criminal Appeals ordered the state trial court to hold a hearing on the issue. Following this hearing, the state trial court determined that Petitioner "voluntarily, knowingly and intelligently" gave up his right to appeal citing *Arkansas v. Whitmore*, 495 U.S. 149 (1990). *Texas v. Murray*, No. 19071 (86th Dist. Ct., Kaufman County, Tex. Dec. 6, 1999). The Texas Court of Criminal Appeals issued an opinion stating that, as a result of Murray's request to waive all appeals, it had submitted the case,

reviewed the record for any fundamental error, and was affirming the judgment of the trial court. *Murray v. Texas*, No. 73,454, slip. op. at 1–2 (Tex. Crim. App. Jan. 20, 2000). Shortly thereafter, Petitioner changed his mind and filed a motion for a rehearing, which was denied.

During the state habeas proceedings, Petitioner argued that the Texas Court of Criminal Appeals violated his right to procedural due process by accepting his waiver and later refusing to grant the motion for rehearing. The state habeas court affirmed and adopted its earlier finding that Petitioner had voluntarily, knowingly, and intelligently given up his right to appeal. (State Habeas Tr. 126.)

Petitioner again raises this challenge in the instant petition. More specifically, Petitioner argues that the state court wrongfully decided that he was competent to waive his appeal. Competency to waive appeals in a capital case is "essentially a factual question." *Rumbaugh v. Procunier*, 753 F.2d 395, 399 (5th Cir. 1985). Therefore, Petitioner is precluded from obtaining habeas relief unless he can show that the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[1] 28 U.S.C.A. § 2254(d)(2) (West Supp. 2006). Under this provision, "a state court decision may be overturned on factual grounds only if its determinations of fact are

---

[1] Due to the nature of the *Rees* standard, this case could possibly be analyzed under the "unreasonable application" clause of § 2254(d)(1). However, the Fifth Circuit and the Supreme Court have both referred to competency to waive appeals as essentially a fact issue and treated it as such. *Demosthenes v. Baal*, 495 U.S. 731, 737 (1990) (holding that state court finding of competence to waive further appeals was entitled to presumption of correctness under pre-AEDPA § 2254); *Rumbaugh*, 753 F.2d at 399 (holding that state court finding of competence was entitled to factual deference under Fed. R. Civ. P. 52(a). Therefore, the Court concludes that it is most appropriate to analyze the case under the "unreasonable determination" clause of § 2254(d)(1).

Regardless, the result would be the same under the "unreasonable application" clause of § 2254(d)(1). The state court adjudication did not result in an unreasonable application of clearly established federal law at the time of the decision.

'objectively unreasonable in the light of the evidence presented in the state-court proceeding.'" *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). While this is a close case, the Court concludes below that the state court's determination of the fact of Petitioner's competency was not objectively unreasonable.

### A. Standard for Competency to Waive Further Appeals in a Capital Case

"The Supreme Court announced the standard to be used in deciding whether a person is mentally competent to choose to forgo further appeals and collateral attack upon his conviction and sentence in *Rees v. Peyton*, 384 U.S. 312, 86 S. Ct. 1505, 16 L. Ed. 2d 583 (1966)." *Rumbaugh*, 753 F.2d at 398. In determining competency to waive further appeals in a capital proceeding, the question is whether the person "has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees*, 384 U.S. at 314.[2]

In *Rees*, the Supreme Court was faced with conflicting psychiatric reports regarding the

---

[2] The Fifth Circuit has stated that this standard is applied by asking up to three questions:
(1) Is the person suffering from a mental disease or defect?
(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?
(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?
*Rumbaugh,* 753 F.2d at 398.
    If the answer to the first question is no, the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent.
*Id.* at 398–99.

competency of a capital petitioner who sought to withdraw his petition for certiorari. *Id.* at 313. The Supreme Court retained jurisdiction over the ultimate withdrawal decision and instructed the Federal District Court to "make a judicial determination as to Rees' mental competence and render a report on the matter to us." *Id.* at 313–14. The Court stated that in making this determination "it will be appropriate for the District Court to subject [the petitioner] to psychiatric and other appropriate medical examinations and, so far as necessary, to temporary federal hospitalization for this purpose." *Id.* The Court also instructed the District Court to "hold such hearings as it deems suitable . . . ." *Id.*

In *Gilmore v. Utah*, 429 U.S. 1012 (1976), the mother of a death row inmate who had instructed his attorneys not to appeal his state capital conviction filed a next friend application for a stay of execution. 429 U.S. at 1013. The inmate responded by challenging the standing of his mother to initiate proceedings on his behalf. *Id.* at 1014. Having examined the transcripts of various state hearings, the Supreme Court concluded that the inmate "made a knowing and intelligent waiver of any and all federal rights he might have asserted after the Utah trial court's sentence was imposed, and, specifically, that the State's determinations of his competence knowingly and intelligently to waive any and all such rights were firmly grounded." *Id.* at 1013. The record in *Gilmore* contained substantial psychiatric evidence supporting a finding of competency to waive appeals. "[T]hree of the five psychiatrists who examined Gilmore in [the pretrial period a month before he sought to waive his appeal] found no evidence of mental illness or insanity."[3] *Id.* at 1015 n.5 (Burger, C.J.,

---

[3] The record did not include the finding of the other two psychiatrists. *Gilmore*, 429 U.S. at 1015 n.5 (Burger, C.J., concurring).

concurring). The state court sua sponte ordered an additional psychiatric examination after trial to "determine his ability to decide not to appeal." *Id.* In response to the court's order, a "Prison Psychiatrist submitted a report, based on a one-hour psychiatric interview and a review of Gilmore's medical records, concluding that Gilmore's decision to waive appeal was the 'product of an organized thought process' and that Gilmore had not 'become 'insane' or mentally ill.'" *Id.* "[T]wo prison psychologists submitted a second report, based on psychological tests and an individual interview, concluding that '[Gilmore] presently has the mental capacity and emotional stability to make the necessary decisions concerning his sentence and to understand the consequences.'"[4] *Id.*

In *Arkansas v. Whitmore*, 495 U.S. 149 (1990), the case that the state court relied upon here, a death row inmate sought to file a next friend petition on behalf of another inmate who had waived his direct appeal. *Whitmore*, 495 U.S. at 153. The Supreme Court held that the inmate did not have next friend standing because he had failed to show that the other inmate was unable to proceed on his own behalf. *Id.* at 163–66. The Court stated that next friend standing does not exist "where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to courts is otherwise unimpeded." *Id.* (citing *Gilmore*, 429 U.S. at 1017 (Stevens, J., concurring)). Examining the record of a state court competency hearing that included testimony regarding a psychiatric interview, the Court found "no meaningful evidence that he was suffering from a mental disease, disorder, or defect that substantially affected his capacity to make an intelligent decision." *Id.* at 165–66 (citing *Rees*, 384 U.S. at 314).

---

[4] There was also evidence, however, that Gilmore attempted suicide shortly after these reports. *Gilmore*, 429 U.S. at 1015 n.5 (Burger, C.J., concurring). Nevertheless, following the suicide attempt, the Prison Psychiatrist reported that the petitioner's mental state was "exactly as described" in the psychiatrist's report to the court before the attempt. *Id.*

In *Demosthenes v. Baal*, 495 U.S. 731 (1990), the parents of a death row inmate filed a next friend application for stay of execution alleging that the inmate was not competent to waive post-conviction federal habeas proceedings. 495 U.S. at 733. The district court denied relief, holding that the parents had failed to establish jurisdiction under *Whitmore*. *Id.* A divided Ninth Circuit panel granted a certificate of probable cause and stayed the execution. *Id.* at 734. The Supreme Court vacated the stay, finding that the state court determination of competence was entitled to a presumption of correctness and that it could not be overturned because it was "fairly supported by the record," as required by the pre-AEDPA version of § 2254. *Id.* The Court made note of the following facts:

> Three psychiatrists who examined Baal had determined he was competent; a psychiatrist who had the opportunity to observe and talk to Baal testified that Baal was competent at the hearing; and the trial court concluded that Baal was competent after both observing Baal and questioning him extensively on the record.

*Id.* at 735. In light of this evidence, the testimony of one psychiatrist who had not personally examined the petitioner that he "may not be competent" was insufficient to warrant either a psychiatric hearing or additional psychiatric examination. *Id.* at 735–36.

### B. The Record Before the State Court

In the instant case, the record before the state court included significant evidence suggesting that Petitioner was competent to waive his appeal. At the waiver hearing, the state judge referred to the trial testimony of Dr. Grigson and Dr. Strayhan:

> Let me make an observation also for the record. There were two very fine psychiatrists testified at the trial, both Doctor Grigson and Doctor – the doctor called by the defense. The record reflects this. Both examined the defendant. Neither testified to any – anything dealing with incompetency. The doctor who testified who was called by the defense was Doctor Strayhan.

> So I am aware of the fact with two very fine psychiatrists, neither one gave any indication during the testimony of any indication of competency.

(Waiver Hr'g Tr. 11, Nov. 19, 1999.)[5]

In addition to the testimony of Dr. Grigson at trial, Petitioner's appellate counsel, Mr. Mitchell, also voiced his opinion at the waiver hearing that Petitioner was competent to waive his appeal:

> One issue of course that was of concern to me was that I wanted to consider the possibility of competency being an issue. I've also talked with the defendant's mother and I have met with him myself.
> While not a psychiatrist, I think I'm in as good a position as any layperson to judge whether or not the man is suffering from mental or emotional problems in making this decision we've discussed quite fully. He's very calm about this decision. He's not seeking publicity. He's not – he's aware of his surroundings. He understands everything I tell him about the case.
> I have explained to him the direct appellate process and how that operates, and he has a good understanding of that. I've explained to him the post conviction writ process, and he has a good understanding of that. And I have distinguished the two types of relief for him.
> . . . .
> I've also talked to his mother about it. There's no indication that he has any competency problems. . . .

*Id.* at 8.[6]

Petitioner also testified at the waiver hearing that he was competent to waive his appeal:

> Q. (By Mr. Conradt) You're not claiming – I think Mr. Mitchell asked you. You're not claiming that you're either incompetent or insane at this time, are you?

---

[5] It should be noted, however, that Dr. Strayhan explicitly stated that he had not examined Petitioner to determine his competency to stand trial and could not say for sure whether he was competent. (Trial Tr. vol. 87, 43, June 8, 1999.)

[6] That said, it is fair to point out that there is some uncertainty in the record as to how familiar appellate counsel was with Petitioner's circumstances. Appellate counsel himself admitted that he had not reviewed the record because it was just filed a few weeks before the hearing. (Waiver Hr'g Tr. 13, Nov. 19, 1999.) In addition, before the hearing, appellate counsel did not know that Petitioner had waived his state collateral review. *Id.* at 8.

> A. No. On the night of what happened, yeah.
> Q. I'm talking about –
> A. I mean I understand.
> Q. – today, November the 19th –
> A. No. No.
> Q. – of 1999 –
> A. No, sir.
> Q. – you're not raising any claim of incompetency or insanity now, are you?
> A. No.
> Q. You're fully aware of your surroundings?
> A. Yeah. Kaufman County.
> Q. Now you know you have the right to have a lawyer, and you have a lawyer now?
> A. (Moving head up and down).
> Q. And you know you're making a mistake by waiving your rights to appeal. You do understand that, don't you?
> A. Yeah, I understand that, but.
> Q. You still want to go ahead and do it?
> A. I want to do it. I can tell you why I want to do it.
> Q. Why do you want to do it?
> A. I want to do it, like I told you while ago about, for the people, the family of the person, of that old lady, Ms. Ratcliff, and I want to do it for myself and so everybody will quit suffering, you know, and get it over with.
>
> And, you know, I look at pictures I got, you know, and sometimes I get down and out, but I catch myself, you know, because I ain't going to kill myself. They sentenced me to death. That's what I – you know, I don't want to set [sic] on death row no – letting the lawyer – and I ain't got nothing against my lawyer. I just don't want to be setting [sic] on death row no however long it takes to just – to find out if you're not going to get it.
>
> Everything was there. I don't know. I don't think you can win it anyway. I don't even want to try. I just want it over with.

*Id.* at 19.

On the other hand, the record before the state court also included some evidence suggesting that Petitioner might be incompetent to waive his appeal. During the punishment phase of the trial, the defense called Dr. Robert Clayton Strayhan, a staff psychiatrist with Dallas County Metro Care Services Mental Health and Mental Retardation facilities. (Trial Tr. vol. 87, 6, June 8, 1999.)

Before testifying, Dr. Strayhan interviewed Petitioner twice, once on April 11, 1999, and again on June 6, 1999. *Id.* at 16. He also interviewed Wanda Murray and examined other documents pertinent to the case. *Id.* at 16–17. During his testimony, Dr. Strayhan stated that Petitioner had been treated for depression starting in February 1999 and had been seen eight to ten times for that complaint. *Id.* at 23. He further testified that Petitioner was given Doxepin, an anti-depressant, and the dosage was gradually increased to 150 milligrams, which in his words "is more in line with the treatment of what psychiatrists call a major depression." *Id.* The doctor also testified that along with this major depression there had been some suicidal ideation and that Petitioner had been placed on suicide watch at least twice. *Id.* In Dr. Strayhan's opinion, "this depression has been different than a situational sadness . . ." and his mental illness "would be best classified as major depression." *Id.* at 23–24. Dr. Strayhan also testified that he had tested Petitioner to determine whether he was psychotic and that Petitioner's score fell below the level of psychopath but within the range for anti-social behavior. *Id.* at 27–28. The doctor also stated that Petitioner had experienced both guilt and nightmares. *Id.* at 25. On cross examination, Dr. Strayhan noted that he was not testifying as to competency:

> Q. Now, you're not saying this Defendant is either insane or incompetent, are you?
> A. No I'm not.
> Q. He's competent?
> A. I did not perform that evaluation. However, I have no reason to suspect that he's incompetent based on informal evaluation. But to be honest, again, I haven't examined him for that area, so I couldn't say for sure.

*Id.* at 43.

In addition to Dr. Strayhan's testimony, the record before the state court also contained

Petitioner's testimony at the waiver hearing regarding his mental state. Petitioner testified on direct as follows:

> Q. Do you think you have any mental or emotional problems about this decision?
> A. No, really, at the time when I did this, I was on drugs, but I ain't crazy.[7] If that's what you're trying to say, no, I ain't crazy.
> Q. Do you think you need to see a psychiatrist or psychologist to make this decision?
> A. No, huh-uh.

(Waiver Hr'g Tr. 15–16, Nov. 19, 1999.) On cross examination, his testimony included the following exchange:

> Q. Okay. Now have you ever been treated for any type of mental disorder?
> A. Huh-uh, no.
> Q. No?
> A. No.
> The Court: Other than Doctor Strayhan and Doctor Grigson seeing you, have you ever been under a psychiatrist's treatment or anything like that?
> The Defendant: Well, since I've been on death – well, since – I was in the County on this charge.
> The Court: Yes, sir.
> The Defendant: I was real bad depressed about what had happened and I finally, you know, I was lying to everybody, you know, and telling them I didn't do this. Or, you know, just I guess trying to make friends, right, and so they wouldn't hate me, but – and I got where I – you know, I didn't care if they hate me or not. I just want – you know, I told them I need something for depression. So they took me to the doctor. Well, it was just a regular doctor.
> The Court: Okay.
> The Defendant: And he give me something like doxepin or something like that, just antidepressant, more or less sleeping pill, really, helps me rest, and I still take that.

*Id.* at 17–18. Petitioner also testified regarding his suicidal ideations:

---

[7] The record is not clear as to whether Petitioner was referring to his anti-depressant medication or illicit drugs. Based on context, it appears that he was referring to his medication.

**Memorandum Opinion and Order**
**No. 3:01-CV-2089-P**
**Page 13 of 19**

      A.  Yes.  My problem is, Mr. Conradt, is, you know, going through what I went through, it's amazing I ain't killed myself, or tried to.
      Q.  Have you tried to?
      A.  No.  I've thought about it.  I've thought about it, and then I talk to somebody.  You know, that's the best thing to do.  They say if you kill yourself, you go to hell.  I don't – you know, I don't think so.  I feel like I'm pretty close to God so I ain't worried about that.

*Id.* at 21.

### C. § 2254(e)(2) Bars Consideration of the Documentary Evidence Not Presented in the State Proceedings

Petitioner also presents new evidence suggesting that he was incompetent to waive his appeal.  Specifically, he provides an expert report by a clinical psychologist, an affidavit from Dr. Strayhan stating that he agrees with the facts and opinions in the expert report, and his own affidavit.  This evidence was presented for the first time during the instant proceedings and has not been ruled on by any state courts.

"With certain exceptions, 28 U.S.C. § 2254(e)(2) bars an evidentiary hearing if the factual basis of a claim was not presented in state court."  *Guidry v. Dretke*, 429 F.3d 154, 159 (5th Cir. 2005).  The Supreme Court recently stated that the restrictions under § 2254(e)(2) also apply "when a prisoner seeks relief based on new evidence without an evidentiary hearing."  *Holland v. Jackson*, 542 U.S. 649, 653 (2004) (citing *Cargle v. Mullin*, 317 F.3d 1196, 1209 (10th Cir. 2003)).  As such, consideration of Petitioner's new documentary evidence is allowed "only if [Petitioner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254(e)(2) were met."  *Id.* at 652–53.

Petitioner's state habeas petition did not allege the existence of new evidence indicating that he was incompetent to waive his appeal, nor did it request an evidentiary hearing to develop such

evidence. Based on his application, the state habeas court found that there were "no controverted, previously unresolved facts material to the legality of the applicant's confinement which require an evidentiary hearing." *Ex Parte Murray*, No. 19071A (86th Dist. Ct., Kaufman County, Tex. Aug. 3, 2001). Petitioner has failed to show that he was not at fault for failing to develop the evidence during the state proceedings. Therefore, pursuant to § 2254(e)(2), Petitioner may not supplement the record with additional documentary evidence not considered by the state court.

**D. The State Court's Factual Determination Regarding Petitioner's Competence to Waive Further Appeals Was Not Objectively Unreasonable**

As discussed above, Petitioner is precluded from habeas relief unless he can show that the state court unreasonably determined that Petitioner was competent to waive further appeals in light of the record before it. While this is a close call, the Court ultimately concludes that the state court's determination was not objectively unreasonable.

In deciding whether an inmate is competent to waive his appeal in a capital case, "[t]he extent and severity of the petitioner's history of mental health problems which have been brought to the court's attention influence the breadth and depth of the competency inquiry required." *Mata v. Johnson*, 210 F.3d 324, 330 (5th Cir. 2000). Under *Rees*, however, there is a "presumption that psychiatric and other medical examinations will be included in the decision making process." *Id.* at 328.

Here, the state court relied upon expert testimony that Petitioner was competent to stand trial given five months before the waiver decision, but did not require additional psychiatric or medical examinations to determine whether Petitioner was competent to waive his appeal. On this particular record, the Court finds that the absence of such evidence did not make the state court's fact-finding

process objectively unreasonable.

While it is true that the standard for determining competency to stand trial differs from the standard for competency to waive appeals in a capital case, there are substantial similarities between the two. *See id.* at 329 n.2. Both "inquire about the discrete capacity to understand and make rational decisions concerning the proceedings at issue, and the presence or absence of mental illness or brain disorder is not dispositive." *Id.* Indeed, some courts have found no difference between them. *See, e.g., United States v. Hogan*, 986 F.2d 1364, 1371 (11th Cir. 1993) ("There is no significant difference between the relative fact-versus-law content of the standard for competency to stand trial and that of the standard for competency to waive post-conviction federal review."); *Giarratano v. Procunier*, 891 F.2d 483, 487 (4th Cir. 1989) ("[T]here is no substantive difference between the two standards" because "[b]oth seek to assure that one charged with crime will not be tried or punished unless he has the mental capacity to understand the situation that confronts him and the ability to consult rationally with his counsel about his defense."); *see also Groseclose ex rel. Harries v. Dutton*, 594 F. Supp. 949, 957 (M.D. Tenn. 1984) (stating that the *Dusky* standard "is equivalent to the Rees competency test" and that both "highlight[] the constitutional necessity that a criminal defendant understand the proceedings and then be capable of aiding his legal counsel in choosing among legal alternatives.").[8] The Supreme Court, for its part, recently stated that "there

---

[8] *But see Rumbaugh*, 753 F.2d at 412 (Goldberg, dissenting) ("The measure of an individual's competency under *Rees* to waive federal habeas review in a death case is informed by considerations very different from those underlying the standard for competency to stand trial. Focusing not merely on the minimal cognitive and communicative capabilities necessary to stand trial, *Rees* requires a finding of incompetency if there is a possibility that a mental disease or defect substantially impairs the individual's rationality. . . . Unlike the question of capacity to participate meaningfully at trial, the question of capacity for rational choice requires a more probing inquiry, where the observer's interpretation is of much greater consequence than his perception.").

**Memorandum Opinion and Order**
**No. 3:01-CV-2089-P**
**Page 16 of 19**

is no indication in [*Rees*] that the phrase ['rational choice'] means something different from 'rational understanding.'" *Godinez v. Moran*, 509 U.S. 389, 398 n.9 (1993).

Additionally, there was no evidence before the state court that Petitioner's condition had changed between the time Dr. Grigson gave his testimony and the waiver decision. *See Mata*, 210 F.3d at 332. Certainly, a significant intervening event had occurred in that Petitioner had been sentenced to death. Nevertheless, nothing in the record before the state court suggested that this event had triggered a significant change in Petitioner's mental condition.

In light of the substantial similarity between the standard for competency to stand trial and the standard for competency to waive appeals in a capital case, the short duration of time between the expert testimony on competency to stand trial and the waiver decision, and the absence of evidence suggesting a change in Petitioner's mental condition between these events, the Court finds that it was reasonable for the state court to rely upon expert testimony regarding Petitioner's competence to stand trial in determining competency to waive further appeals. *See id.* at 333 (stating that a district court deciding whether to allow a capital petitioner to waive further collateral review would be "justified in presuming that a petitioner continues to be competent" following "a reliable, constitutionally adequate competency determination").[9]

The Court also notes that the state court gave Petitioner an opportunity to present evidence regarding his competence, engaged in face-to-face dialogue with him, and observed his testimony at the waiver hearing. *Id.* Moreover, no one at the time of the waiver hearing, not even Petitioner's

---

[9] The Fifth Circuit panel did also note, however, that "such a presumption cannot survive a twelve year gap, coupled with . . . extensive evidence of incompetency . . . ." *Mata*, 210 F.3d at 333.

attorney, argued that Petitioner was incompetent.

Based on this record, the Court concludes that the state court's factual determination regarding Petitioner's competency to waive further appeals was not objectively unreasonable. While the better practice may have been for the state trial court to have ordered additional psychiatric and medical examinations before finding Petitioner competent to waive his appeal, that is not the applicable test under § 2254(d)(2). Under the habeas statute, the state court adjudication must have resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Based on this record, the Court cannot say that this is true here. As such, Petitioner is not entitled to habeas relief under § 2254(d)(2).

## IV. Certificate of Appealability

Under AEDPA, Petitioner must obtain a Certificate of Appealability (hereinafter "COA") before he can appeal this Court's denial of habeas relief. *See Coleman v. Quarterman*, No. 05-70005, 2006 U.S. App. LEXIS 18056, at *3–4 (5th Cir. July 18, 2006). In order to be entitled to a COA, Petitioner "must make 'a substantial showing of the denial of a constitutional right,' 28 U.S.C. § 2253(c)(2), such 'that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong,' *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000)." *Id.* at *4. "Because the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [Petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). In this case, reasonable jurists would debate whether the Court was correct in finding that the habeas corpus petition is barred by § 2254(d)(2). As such, the Court hereby GRANTS a Certificate of Appealability sua sponte.

**Conclusion**

Given the finality of capital punishment as well as society's interest in reliability in capital proceedings, the Court is troubled by (1) appellate counsel's decision not to obtain psychiatric and other medical examinations regarding Petitioner's competence to waive his direct appeal, (2) the state trial court's failure to require such evidence, and (3) the state appellate court's decision to deny a motion for rehearing just months after the waiver decision where this was the only waiver/revocation and there was no indication or finding that Petitioner intended to manipulate the appellate process. Nevertheless, for the reasons stated above, the Court concludes that Petitioner is not entitled to relief under 28 U.S.C. § 2254. As such, the Court hereby DENIES Petitioner's Second Amended Petition for Habeas Corpus and GRANTS a Certificate of Appealability.

**IT IS SO ORDERED.**

Signed this 20th day of September 2006.

_JORGE A. SOLIS_
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE